

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7200 | **DATE** | 12/6/2001 |
| **CASE TITLE** | Clifton Sayles vs. JoAnne B. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐   Filed motion of [ use listing in "Motion" box above.]

(2)  ☐   Brief in support of motion due _____.

(3)  ☐   Answer brief to motion due _____. Reply to answer brief due _____.

(4)  ☐   Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐   Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐   Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐   Trial[set for/re-set for] on _____ at _____.

(8)  ☐   [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐   This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
         ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP(a)(2).

(10)  ■   [Other docket entry]   **ENTER MEMORANDUM OPINION AND ORDER.** The Commissioner's motion for summary judgment [doc. # 17-1] is denied; the plaintiff's motion for summary judgment [doc.# 14-1] is granted. The Court reverses and remands this case to the Commissioner for further proceedings consistent with this opinion, pursuant to Sentence IV, 42 USC § 405(b). This case is terminated.

(11)  ☐   [For further detail see order (on reverse side of/attached to) the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

JJK   courtroom deputy's initials

number of notices

DEC 0 7 2001

date docketed

docketing deputy initials

12/6/2001

date mailed notice

JJK

Date/time received in central Clerk's Office

mailing deputy initials

01 DEC -6 PM 1:15

**Document Number**

19

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**DOCKETED**

DEC 0 7 2001

CLIFTON SAYLES,           )
    Plaintiff,       )
    vs.              )   No. 00 C 7200
                     )   Magistrate Judge Schenkier
JO ANNE B. BARNHART,[1]   )
Commissioner Social Security Administration,   )
    Defendant.       )

## MEMORANDUM OPINION AND ORDER

The plaintiff, Clifton Sayles ("Mr. Sayles"), seeks judicial review of a final decision by the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his claim for Social Security Income ("SSI"), pursuant to 42 U.S.C. § 405(g)(2001). Mr. Sayles seeks summary judgment reversing the Commissioner's decision denying him SSI or, in the alternative, a remand of the case to the Commissioner for further proceedings (doc. # 14-1). The Commissioner has filed a cross-motion for summary judgment to affirm her decision below (doc. # 17-1). By virtue of the consent of the parties and pursuant to 28 U.S.C. § 636(c), the case has been assigned to this Court for all proceedings, including the entry of final judgment (doc. ## 8-9). For the reasons stated below, the Court denies the Commissioner's motion for summary judgment and grants the motion of Mr. Sayles for a remand.

---

[1] JoAnne Barnhart, the new Commissioner of Social Security, is automatically substituted as the defendant for Larry Massanari, the former Acting Commissioner of Social Security, pursuant to Fed.R.Civ.P. 25(d).

## I.

On August 17, 1998, Mr. Sayles filed an application for SSI, alleging a disability beginning on June 1, 1997 (R. 118-19). The Agency found that Mr. Sayles was not disabled, both initially and on reconsideration (R. 72-73). On December 16, 1999, Mr. Sayles, represented by counsel, appeared at a hearing before an Administrative Law Judge ("ALJ") (R. 36-71); and the ALJ subsequently issued a written decision, dated February 22, 2000, denying Mr. Sayles SSI benefits (R. 11-21). Mr. Sayles filed a Request for Review, and on September 29, 2000, the Appeals Council denied the request, making the decision of the ALJ the final decision of the Commissioner (R. 5-6). Mr. Sayles subsequently filed a timely complaint in federal court seeking judicial review of the administrative decision.

## II.

The following facts are taken from the administrative record and the administrative hearing where Mr. Sayles testified. We begin with Mr. Sayles's testimony regarding his personal history and his physical impairments.

## A.

Mr. Sayles was born on May 30, 1949 (R. 118). He has an eleventh grade education (R. 143). His past employment includes car repair, landscaping, window washing, maintenance, rubbish disposal, and painting (R. 44, 66, 132). However, the only jobs he performed where he earned any substantial income were those of maintenance worker and trash collector (R. 14).

Mr. Sayles stopped working on June 1, 1997, because he was convicted and sent to prison for sale and delivery of a controlled substance (R. 44, 120, 126, 132). Mr. Sayles was released from prison in 1998, and he is currently on parole (R. 44). Since his release, Mr. Sayles has lived with

various family members, and he currently lives with his brother and sister-in-law (R. 43). Mr. Sayles does not pay rent or contribute to mortgage payments because he is unemployed and has no source of income (R. 43).

During the day, Mr. Sayles spends his time at the corner store and barber shop, visiting with other men who also spend their time there (R. 53). Sometimes Mr. Sayles rides a bicycle to the store, and sometimes he walks the couple blocks (R. 54). Mr. Sayles watches television, reads the newspaper, and does about ten sit ups every other day (R. 53-54). But, other than going to this store, he does not leave the house (R. 55). Mr. Sayles says that he buys groceries, cooks for himself and sometimes washes dishes, but he does not clean the house or do laundry (R. 53-54). Mr. Sayles does bathe and dress himself (R. 54), and he takes a nap for a couple of hours every day after lunch (R. 62, 63).

Mr. Sayles claims that his various physical impairments make it difficult for him to do any of these activities for any extended period of time – even though he admits that he can sit all day and lift up to 50 pounds (R. 51). For example, Mr. Sayles says his ability to stand is limited to one hour because he suffers from diabetes, and as a result, suffers from foot ulcers which cause his feet to ache (R. 49), and his legs to tire (R. 51, 56). Mr. Sayles also claims a need to frequently urinate, up to seven times per day and every hour at night – which leaves him tired during the day (R. 61). Mr. Sayles also has glaucoma, with his right eye more affected than his left (R. 46-47). Consequently, Mr. Sayles says that he must close and rest his eyes after concentrating or focusing on something, and he indicates that he takes medication eye drops for this condition (R. 47, 50). Also, Mr. Sayles testified that if he reads for more than 45 minutes, the "lines run together" (R. 50). At night, Mr. Sayles cannot see because "everything is blurry"; his peripheral vision is limited, especially on

the right side; and he finds himself unable to judge distances (R. 50, 59). Mr. Sayles also believes that his vision is getting "dimmer" and, due to depth perception problems, he sometimes knocks things over when he reaches for them (R. 60). Mr. Sayles has also suffered from asthma all of his life (R. 48). He uses an inhaler every day (R. 49); and he cannot walk more than a few blocks without feeling short of breath (R. 50). Dust, perfume, dry air, cigarette smoke and bleach cause his asthma to flare up (R. 57); and he has had to go to the emergency room in the past because of asthma attacks (R. 50-51).

Mr. Sayles testified that as a side effect resulting from the insulin he takes for his diabetic condition, he sometimes feels weak and dizzy (R. 50). Mr. Sayles also uses eye drops for his glaucoma, which causes his eyes to burn (R. 62). Consequently, he must keep his eyes closed for 1-1/2 hours after using the drops (R. 62). Other than prescribed medications, Mr. Sayles denies any other illegal drug use (R.52, 150). Mr. Sayles admits, however, that he still consumes a few beers on occasion, even though he claims to have suffered from and to have received treatment for alcohol abuse (R. 51-52, 150).

### B.

The medical evidence in the record confirms Mr. Sayles testimony that he suffers from glaucoma, insulin dependent type II diabetes mellitus and asthma. The medical records documenting these conditions date back to early 1998, while Mr. Sayles was imprisoned. We will review the medical evidence in chronological order.

Various prescription orders for Humulin and/or insulin, as well as eye drops for his glaucoma date from February 1998 (R. 187-88). In a routine physical by the Illinois Department of Corrections ("IDOC"), dated May 4, 1998, Dr. Hawk noted that Mr. Sayles had asthma and glaucoma and was

4

a diabetic (R. 158). She made no recommendations, nor did she indicate the severity of his conditions at that time. In medical progress notes written by a nurse on June 18, 1998, shortly before Mr. Sayles's release, it was noted that Mr. Sayles was an insulin dependent diabetic, was taking Humulin and wore glasses (R. 159).

The next series of medical reports begin in September 1998, after Mr. Sayles filed his application for SSI (R. 164). On September 2, 1998, Dr. Bhushau prepared a report indicating a diagnosis of diabetes, glaucoma and asthma. Dr. Bhushau also noted that Mr. Sayles had poor vision due to his glaucoma. She recommended a treatment plan of Humulin for his diabetes, and other drugs, such as eye drops, for Mr. Sayles's glaucoma (R. 189). There is also a report from St. Francis Hospital, dated September 2, 1998, indicating that Mr. Sayles had no treating physician, but he did have diabetes, glaucoma and decreased vision in his right eye (R. 190-91). This report indicates that Mr. Sayles's asthma was under control at that time (R. 191), and that he had not used any illegal drugs for the past three years (*Id.*). This medical report indicated that Mr. Sayles claimed an inability to work due to his need to use eye drops (R.192). Mr. Sayles also claimed stress due to recent release from the penitentiary (R. 192). There is a second report from St. Francis, dated September 9, 1998, that did not indicate any specific complications from Mr. Sayles's diabetic condition, even though there was a place on the form to indicate those limitations (R. 183).

On September 25, 1998, Dr. Hilton Gordon examined Mr. Sayles at the request of the Agency. Dr. Gordon confirmed that Mr. Sayles had insulin dependant diabetes, glaucoma and asthma. He noted that Mr. Sayles's "right eye is worse than the left and is somewhat blurred at time[s]," and that Mr. Sayles uses eye drops daily (R. 170). However, according to Dr. Gordon, Mr. Sayles reported that his eyesight "seems to be okay when he wears his glasses" (R. 170). The report

does not indicate that Mr. Sayles made any complaint or mention about side effects from the eye drops. Dr. Gordon also noted that Mr. Sayles denied "polyuria" (or frequent urination) as a result of his diabetic condition at that time (R. 170).

On September 25, 1998, Dr. Mejia performed an ophthalmologic evaluation at the Agency's request. Dr. Mejia reported that Mr. Sayles had a history of diabetes and glaucoma. He indicated that Mr. Sayles's uncorrected visual acuity was 20/70 in the right eye and that his best corrected visual acuity in the right eye was also 20/70. In the left eye, Mr. Sayles's uncorrected visual acuity was 20/70 and his best corrected visual acuity was 20/30 (R. 164). Dr. Mejia reported that Mr. Sayles's visual fields in the right eye were markedly constricted and almost non-existent; and, in the left eye, they were also markedly constricted (R. 164, 165). Dr. Mejia diagnosed Mr. Sayles with end-stage glaucoma (R. 165). He indicated, however, that the "pressures are well-controlled" (R. 165).

On October 3, 1998, an Agency examiner made a residual functional capacity ("RFC") assessment of Mr. Sayles (R. 172-79). This assessment stated that Mr. Sayles had "no complications" from his diabetes, but he did have bilateral "marked field restrictions" from the glaucoma in his eyes (the report does not indicate which eyes), which were 20/70 and 20/30 (R. 173, 175). The examiner also noted that with respect to Mr. Sayles's asthma, his lungs were clear (R. 173), but he should "avoid concentrated exposure" to "fumes, odors, dusts, gases, poor ventilation" etc. (R. 176). With respect to Mr. Sayles's physical RFC, the examiner indicated that Mr. Sayles could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk for a total of 6 hours in an 8 hour work day, and had unlimited abilities to push or pull (R. 173). The examiner noted no other relevant limitations (R. 174-79).

6

The next report was prepared by Dr. Olajos at St. Francis Hospital, and is dated October 7, 1998 (R. 182). Dr. Olajos noted that Mr. Sayles was "stressed" and admitted using "ETOH" and cocaine recently, as much as two times per week (R. 182). Mr. Sayles told Dr. Olajos that he had come to the hospital because he had the flu and he wanted "to get some glucose" because it cost "around 100" (presumably $100.00). The doctor indicated that Mr. Sayles had an "acute problem" with drug use and he referred him to OATES for possible detox and hospitalization (R. 182).

On December 17, 1998, Dr. Michael, a consulting physician to Dr. Olajos, made the following diagnosis after examination of Mr. Sayles: end-stage glaucoma in the right eye with moderate signs of glaucoma in the left eye. He also concluded that Mr. Sayles had diabetes "but fortunately shows no diabetic retinopathy" (R. 291). Dr. Michael also reported that Mr. Sayles's visual acuity measured 20/400 in the right eye "pinholing" to 20/100 and 20/20 in the right eye (R. 291). Dr. Michael referred Mr. Sayles for eye laser surgery, which was conducted in early 1999 (R. 279, 281).

On February 18, 1999, Dr. Finder, an eye physician and surgeon evaluated Mr. Sayles at the Agency's request. He found that:

> Mr. Sayles's visual disability is that of severe monocular visual loss with relatively normal vision in the fellow eye. He would be expected to have difficulty with tasks requiring stereopsis. There is also very limited peripheral vision to the right side.

(R. 271-72). Dr. Finder indicated, however, that Mr. Sayles "intra ocular pressure" was "under control," as was his diabetes when he took Humulin (R. 270). Dr. Finder's prognosis for Mr. Sayles was "fair to good" (R. 271). He also found that there "do not appear to be any limitations in his ability to hear, sit, stand, walk, lift, carry or handle objects" (R. 272).

On February 25, 1999, Dr. Enacopol examined Mr. Sayles at the Agency's request. She found that Mr. Sayles's "eye problems started in conjunction with his diabetes in 1987" and had been getting progressively worse, even though Mr. Sayles had not been diagnosed with diabetes until 1997 (R. 242). In addition, Dr. Enacopol saw foot ulcers on examination, but found no other problems and noted that his asthma was "well-controlled" (R. 242). Dr. Enacopol provided no detail as to the extent of the foot ulcers, or their effect (if any) on Mr. Sayles's functional capabilities.

In a residual functional capacity assessment dated March 16, 1999, an Agency examiner found that Mr. Sayles was only "slightly limited" in his daily living activities and social functioning, and "seldom" would experience deficiencies in concentration, persistence or pace that would affect his ability to function at work (R. 256). He reported that Mr. Sayles was moderately limited in his ability to understand and remember detailed instructions, and in his ability to carry out detailed instructions (R. 259). The examiner also indicated that Mr. Sayles only has the mental capacity to perform simple tasks (R. 260).

In a second assessment performed on March 31, 1999, an Agency examiner found that Mr. Sayles's ambulation and fine and gross manipulation were "unimpaired" (R. 263). The examiner concluded that Mr. Sayles's asthma was well-controlled, but he had "little vision" and/or "no useful vision" in his right eye, and "good vision and good visual field in the left eye" (R. 264-65). The Agency examiner also found that Mr. Sayles' depth perception was limited (R. 265). With respect to environmental restrictions, and as a result of these limitations, the Agency examiner concluded that "[d]ue to poor vision in the right eye, for safety's sake [Mr. Sayles] should avoid heights and moving machinery" (R. 266).

## C.

In a written decision, the ALJ made the following findings based on the medical evidence and the claimant's testimony. The ALJ found that Mr. Sayles had the exertional residual functional capacity ("RFC") to lift and carry up to 25 pounds frequently and 50 pounds occasionally (R. 18). The ALJ also concluded that Mr. Sayles has the RFC to sit without interruption for six hours; stand without interruption for 6 hours and walk for up to 6 hours (R. 18). However, this exertional RFC, according to the ALJ, is limited by the claimant's non-exertional inability to work at unprotected heights, or around moving and/or hazardous machinery, "which includes driving motorized vehicles for work purposes" (R. 20). The ALJ also found that the claimant could not work at jobs requiring good bilateral or peripheral vision, due to his glaucoma, and he also needed to avoid concentrated exposure to dust, noxious odors and fumes, due to his asthma (R. 20). And, in addition, the ALJ concluded that the claimant's exertional RFC was limited by his ability to perform only simple, routine tasks (R. 18).

The ALJ, however, did not find "fully credible" Mr. Sayles's other complaints – such as foot ulcers, the need to frequently close his eyes, and the need to urinate frequently during the day and even more often at night (leading to a need to rest during the day due to sleep deprivation) (R. 17, 19). According to the ALJ, Mr. Sayles's complaints of the extent of his condition were "not fully credible" based on (1) his own testimony regarding his ability to lift 50 pounds, stand for one hour, walk a couple of blocks and sit without any problems; (2) his testimony regarding his daily activities; and (3) the medical evidence (including the fact that no doctor's report in the record indicated an inability to work) (R. 18).

Given these findings, the ALJ concluded that Mr. Sayles had a severe impairment or impairments that did not meet or medically equal one of the listed impairments in the regulations (R. 19) and, at Step 4, that Mr. Sayles could not perform his past relevant work as a maintenance worker because such work was classified as heavy in its exertional requirements (although unskilled) (R. 18-19). At Step 5, the ALJ used the Grid as a framework for his decision and found that, based on her RFC findings, Mr. Sayles could perform a "significant range" of medium work (which also subsumes light and sedentary work) in the national economy (R. 19). However, the ALJ did not use the Grid to direct a non-disabled finding, because Mr. Sayles's ability to perform "all or substantially all medium work is impeded by additional exertional limitations" (R. 19). The ALJ, therefore, called in a vocational expert who testified that, assuming the work restrictions noted by the ALJ in her RFC finding, Mr. Sayles could work as a "hand packager and bagger" and that "there were approximately 28,000 such jobs existing in the regional economy" (R. 19). Based on the VE's testimony and her own RFC findings, the ALJ thus concluded that Mr. Sayles was not disabled at Step 5 (R. 19-20).

### D.

The VE did, indeed, testify that Mr. Sayles could perform work as a hand packager and bagger, but her testimony contained numerous qualifications not pointed out by the ALJ in her written opinion. The VE initially was asked to assume that Mr. Sayles could stand, sit and walk for six hours, lift and carry up to 25 pounds frequently and 50 pounds occasionally, but (a) is limited to jobs that are simple and routine, that do not require good bilateral or peripheral vision or any depth perception in one eye, and (b) "must avoid *concentrated* exposure to any activities involving unprotected heights, being around moving and hazardous machinery, driving motorized vehicles for work purposes, and dust, odors, fumes, and gases" (R. 66) (emphasis added). Based on these factors,

the VE found that there were three types of jobs that existed in substantial numbers in the Chicago area that Mr. Sayles could perform: cleaner at the light exertional level (5,600 jobs); bagger (23,000 jobs); and hand packager (5,000 jobs) (R. 67). The ALJ then asked whether those jobs still would be available "if the person could have *no* exposure to any unprotected heights or moving and hazardous machinery" (R. 67) (emphasis added). In response, the VE initially testified that there were no jobs Mr. Sayles could perform in significant numbers in the Chicago area (R. 68).

The VE based this on the view that baggers frequently would have to take parcels to customers in parking lots, thus exposing baggers to moving cars (R. 68). The ALJ clarified that she did not include moving cars in the "hazardous machinery" used in her modified hypothetical; in response, the VE testified that Mr. Sayles still could perform the job of a bagger (R. 68). But the VE was never specifically asked, nor did she offer any testimony, as to how many of the 23,000 bagger jobs would be available given these additional limitations.[2] The VE further testified that assuming Mr. Sayles's limitations and restrictions were as he described them, there were no jobs he could perform (R. 69).

On cross-examination by the claimant's attorney, the VE was asked whether certain additional limitations would preclude or impact substantial gainful activity. In response, the VE said the need to urinate every hour would "impact" Mr. Sayles's ability to work, although the need to do so every two hours would not (R. 69-70); depth perception problems that made it difficult for him to "grab for an item" for which he was reaching also would "impact" his ability to work (R. 70); and

---

[2] The ALJ also varied the first hypothetical, with the sole change being to vary the exertional limits to lifting and carrying 10 pounds frequently and 20 pounds occasionally. The VE testified that under that hypothetical, there would be more than 11,000 jobs available (R. 68-69).

11

that the inability to focus for more than one hour and the need to close his eyes for 45 minutes thereafter would preclude substantial gainful activity" (R. 70).

## III.

In order to establish a "disability" under the Social Security Act (the "Act"), a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can . . . be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A)(2001). A claimant must demonstrate that his impairments prevent him from performing not only his past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A). The social security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (2001). Under this rule, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520; *see also Young v. Secretary of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or 5. A negative answer at any step other than Step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.* In cases of severe impairment, the ALJ's analysis at Step 4 typically involves an

evaluation of the claimant's residual functional capacity to perform the past relevant employment. *See* 20 C.F.R. § 404.1520(e). If a person can still do this kind of work, the Commissioner will find that the person is not disabled. *Id.* The Step 5 analysis involves an evaluation of the claimant's residual functional capacity to perform any other work in the national economy (other than the relevant past employment). *See Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); 20 C.F.R. § 1520(f).

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept the findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g) (2001), which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quotations omitted). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). *See also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Secretary of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir. 1986) (per curium).

However, the Commissioner (or ALJ) is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence and may not select and discuss only that evidence which

favors his or her ultimate conclusion. *See Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id. See also Young*, 957 F.2d at 393 (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review); *Guercio v. Shalala*, No. 93 C 323, 1994 WL 66102, *9 (N.D. Ill. 1994) (ALJ need not spell out every step in reasoning, provided the ALJ has given sufficient direction that the full course of the decision may be discerned) (citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988)). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See, e.g., Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir. 2001) (*quoting Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). This is especially true regarding credibility determinations, since both the case law and the regulations require an ALJ to minimally articulate the specific reasons for the credibility finding. *Zurawski*, 245 F.3d at 887. Specific reasons are required so that the reviewing Court can ultimately assess whether the ALJ's determination was supported by substantial evidence or, if not, was "patently wrong." *Id.* (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

## IV.

At Step 5 of the sequential evaluation, the ALJ determined that Mr. Sayles was not disabled because he had the residual functional capacity to perform a substantial number of jobs existing within the Chicago metropolitan area, namely, the jobs of hand packager and bagger (28,000 jobs total). Mr. Sayles challenges the ALJ's determination on three grounds. *First*, he argues that the ALJ did not meet her burden at Step 5 to prove that a substantial number of jobs exist in the national

14

economy which Mr. Sayles has the residual functional capacity to perform (Pl.'s Mem. at 9-12). *Second,* he argues that the ALJ failed to consider medical evidence that favored his disability claim (Pl.'s Mem. at 12-13). *Third,* he argues that the ALJ's credibility determinations are patently wrong because they were based on unreasonable inferences and factual errors (Pl.'s Mem. at 13-15).

Upon reviewing the record and the arguments of the parties, the Court concludes that the decision must be remanded to allow the ALJ to address shortcomings in the analysis at Step 5.

## A.

In this case the VE was asked by the ALJ and Mr. Sayles's counsel to express opinions on available work based on no fewer than eight hypotheticals. *First,* the ALJ asked to express an opinion about available work in response to a hypothetical based on Mr. Sayles having exertional limitations that permitted him to perform medium work, along with a variety of non-exertional limitations including that he must avoid "concentrated exposure" to the activities involving unprotected heights, being around moving and hazardous machinery, driving motorized vehicles for work purposes (R. 66). In response, the VE identified bagger (23,000), cleaner (5,600) and hand packager (5,000) jobs. *Second,* the ALJ asked the VE how her opinion would be affected if the first hypothetical was changed so that the person could not have any exposure to unprotected heights or moving in hazardous machinery, rather than simply avoiding concentrated exposure (R. 67-68). The ALJ said no jobs would be available. *Third,* the ALJ then asked the VE to vary that hypothetical further, by excluding from the definition of "moving and hazardous machinery" exposure to moving cars in parking lots (R. 68). On that hypothetical, the ALJ said that bagger jobs still would be available, but not cleaner or hand packager jobs. *Fourth,* the VE was then asked to vary the first hypothetical by assuming the same non-exertional limitations, but changing the exertional limitations

15

to those consistent with performing light rather than medium work (R. 68-69). The VE identified 11,200 available jobs. *Fifth*, the ALJ asked the VE to assume that Mr. Sayles had all of the restrictions and limitations to which he testified (R. 69). The VE responded that on that assumption, no jobs would be available.

On cross examination, Mr. Sayles's attorney then asked four more hypotheticals. The *sixth* hypothetical required the VE to assume that Mr. Sayles would have to urinate every hour or every other hour during the work day; in response, the VE said the former would preclude work opportunities, but not the latter. In the *seventh* hypothetical, the VE was asked to assume that Mr. Sayles could not focus on an object for more than 45 minutes to one hour, and that when he did so, he would then have to close his eyes to rest them for 45 minutes or so; in response, the VE said this limitation would preclude substantial gainful activity. The *eighth* hypothetical required the VE to assume that Mr. Sayles's depth perception problems would cause him to have difficulty grabbing an item, with the result that he would sometimes miss it or knock it over; the VE said this would "impact" his ability to perform work.

The fundamental problem with the ALJ's determination is that both in the body of her ruling (R. 19) and in her findings (R. 20), she addressed the VE's opinion in response to only one of the hypotheticals – the first one – and disregarded the others. Case law in the Seventh Circuit holds that "[a]n ALJ may not simply select and discuss only that evidence which favors his [or her] ultimate conclusion. Rather, an ALJ's decision must be based upon consideration of all the relevant evidence." *See, e.g., Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000) (citations omitted). We believe that this general rule has special force in cases where the ALJ solicits the testimony and opinions of a vocational expert at Step 5, but then proceeds to disregard this testimony without explanation. *See,*

*e.g., Griffin v. Massanari,* No. 00 C 7109, 2001 WL 1064476, * 10 (N.D. Ill., Sept. 13, 2001) ("[h]aving elicited the testimony of a vocational expert, the ALJ was not entitled to simply ignore significant portions of it"). *See also Connor v. Shalala,* 900 F. Supp. 994, 1003 (ALJ did not consider VE's testimony on cross-examination and failure to articulate basis for rejecting this evidence was basis for remand where VE's testimony essential to ALJ's finding of not disabled).

The ALJ's failure to address the other hypothetical scenarios is particularly problematic in this case, because the opinion of the VE about available work that the ALJ adopted (R. 20, Finding No. 12) was based on a hypothetical that departs from the factual findings that the ALJ made (R. 20, Finding No. 6). The ALJ adopted the VE's opinion that there would be 28,000 hand packager and bagger jobs available to a person with the exertional and non-exertional limitations expressed in the first hypothetical, which posited that the individual could not have "concentrated exposure" to driving motorized vehicles for work purposes, or activities involving unprotected heights or being around moving and hazardous machinery (R. 66-67). However, in her findings, the ALJ determined that Mr. Sayles "cannot" work at unprotected heights around moving and hazardous machinery, which includes driving motorized vehicles for work purposes (R. 20, Finding No. 6). An absolute bar on such activities is obviously a more extreme limitation than a bar which would prevent "concentrated" – but not occasional or periodic – exposure.

And that is borne out by the VE's opinion about available work in response to the second hypothetical, which asked the VE to accept all assumptions in the first hypothetical, but one: to assume that a person could have "no exposure" (rather than no "concentrated exposure") to unprotected heights or moving and hazardous machinery. With that one change in the scenario, the VE testified that none of the 28,000 bagger and cleaner jobs would be available (R. 67-68).

17

The ALJ offered no explanation for how she could conclude that 28,000 jobs would be available, when her factual findings contain non-exertional limitations which are inconsistent with that conclusion. If that was all that the record disclosed, then a reversal would be in order -- but there is more.

In the third hypothetical, when the ALJ defined "moving and hazardous machinery" to exclude exposure to cars being driven by others in a parking lot, the VE opined that the cleaner and hand-packager jobs would be unavailable, but that jobs as a bagger still would be available (R. 68). This evidence might support a conclusion that there are significant other jobs that Mr. Sayles could perform, but we cannot reach that conclusion on the present record. The ALJ has offered no explanation for excluding moving automobiles from the classification of "moving and hazardous machinery" that Mr. Sayles must avoid. To be sure, the fact that the ALJ concluded that Mr. Sayles may not drive motorized vehicles for work purposes (R. 20) does not automatically mean that Mr. Sayles must avoid exposure to all moving vehicles at the workplace. Indeed, there is evidence from Mr. Sayles own testimony that he regularly rides a bike or walks several blocks on city streets, which one would expect would require him to negotiate intersections and thus deal with moving cars. But if the ALJ concluded that Mr. Sayles's limitations did not require him to avoid work that brought him into some exposure to moving cars, it was incumbent upon the ALJ to provide at least a "glimpse into [her] reasoning." *Zurawski*, 245 F.3d at 887. Her failure to do so here warrants reversal and a remand.[3]

---

[3] The Court also notes that there is some ambiguity in the VE's testimony concerning the number of bagger jobs that would be available if exposure to moving cars in parking lots were excluded from the classification of "moving and hazardous machinery" that the ALJ found Mr. Sayles must always avoid. The Commissioner argues that the VE testified that all 23,000 bagger jobs originally identified by the VE would remain available. But, while that may be a reasonable inference from the testimony, the ALJ never expressly states the number of jobs that would be available given this limitation. We see no reason why this point – which is part of the Commissioner's burden of proof at Step 5 – should

## B.

The foregoing decision to remand the case makes it unnecessary for the Court to address Mr. Sayles's other arguments. However, before closing, we do wish to discuss briefly certain credibility determinations that likely will be important on remand.

In her findings, the ALJ found that Mr. Sayles suffers from a variety of significant non-exertional limitations. However, she did not accept certain additional non-exertional limitations that Mr. Sayles claimed to have: in particular, a need to urinate frequently; problems with grabbing or knocking over items because of inadequate depth perception; and an inability to focus for more than 45 minutes to an hour, with the need thereafter to rest his eyes for up to 45 minutes. We focus on these specific assertions because, on cross examination by Mr. Sayles's attorney, the VE expressed the view that these limitations could preclude Mr. Sayles from working.

Implicit in the ALJ's determination is a finding that Mr. Sayles's testimony about these limitations was not credible. We say that this is implicit in the ALJ's determination because although the ALJ did not specifically so state, she must have rejected the credibility of these asserted limitations — otherwise, the VE's testimony would have led her to conclude that there were not significant jobs in the economy that Mr. Sayles could perform. While an ALJ's credibility assessment is afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility, *Shramek v. Apfel*, 226 F.3d 808, 811 (7th Cir. 2000), that deference is premised upon the ALJ providing an explanation as to the credibility determinations that she makes so that a court may assess if those determinations are supported by substantial evidence or instead are "patently wrong." *Powers*, 207 F.3d at 435.

---

have any ambiguity to it. Therefore, on remand, the Court would expect that this point would be clarified.

Thus, when an ALJ finds that a claimant is not credible with respect to his or her exertional or non-exertional impairments, the ALJ must offer "specific reasons for the finding on credibility, supported by the evidence in the case record, and . . . sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual statements and the reasons for that wait." SSR 96-7 p. When "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result," the ALJ's determination cannot stand. *Shramek*, 226 F.3d at 811 (citations omitted); *see also Zurawski*, 245 F.3d at 887-89. Nor can an ALJ's determination stand when no explanation at all is given for critical credibility determinations. When a decision is devoid of reasoning that charts a path from the evidence to the ALJ's conclusion, a reversal and remand is required both by regulation SSR 96-7 p and the case law. *Zurawski*, 245 F.3d at 887-89.

The ALJ here did not explain why she failed to credit Mr. Sayles's testimony concerning the limits on his ability to focus his eyesight, and the need to close his eyes after focusing for a relatively short period of time. Likewise, the ALJ did not explain why she did not find credible Mr. Sayles complaints about the effect his lack of depth perception has on his ability to grasp objects. Nor did the ALJ seek clarification as to the frequency with which Mr. Sayles claims the need to urinate during the day, a point which was of some significance to the VE: he testified that the need to do so every other hour would not preclude substantial gainful activity, but the need to do so every hour would. On remand, we expect that the ALJ will take evidence as needed to eliminate such ambiguities, and will explain her reasoning for credibility determinations that she makes concerning Mr. Sayles's professed limitations, particularly ones that (based on the VE's testimony) may be critical as whether there is available for Mr. Sayles a substantial number of jobs.

## CONCLUSION

The Commissioner's motion for summary judgment (doc. # 17-1) is denied; the plaintiff's motion for summary judgment (doc. # 14-1) is granted. The Court reverses and remands this case to the Commissioner for further proceedings consistent with this opinion, pursuant to Sentence IV, 42 U.S.C. § 405(b). This case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: December 6, 2001